

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| EVELYN KNIGHT, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | ) |
| | )    **Civil Action No. 04-S-634-NE** |
| PETE GEREN, Acting Secretary | ) |
| of the United States Department | ) |
| of the Army,[1] | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION

This employment discrimination action is before the court on defendant's motion for summary judgment.[2]  Upon consideration of the pleadings, evidentiary submissions and briefs, this court concludes the motion is due to be granted.

Federal Rule of Civil Procedure 56 provides, in part, that summary judgment not only is proper, but "*shall be* rendered *forthwith* if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

[1] The original defendant in this action was R. Les Brownlee, Acting Secretary of the United States Department of the Army at the time the complaint was filed.  *See* doc. no. 1 (Complaint). When Dr. Francis J. Harvey took office as Secretary and assumed Mr. Brownlee's duties, he was automatically substituted as the proper defendant pursuant to Fed. R. Civ. P. 25(d)(1).  Recently, Pete Geren replaced Dr. Harvey as Secretary and, also, as the proper defendant to this cause.  *See id.*

[2] Doc. no. 34 (Motion for Summary Judgment).  The court notes that defendant has titled its motion "Defendant's Motion to Dismiss and for Summary Judgment."  *Id.*  Even so, it appears clear that the intent was to seek relief pursuant to Fed. R. Civ. P. 56(b), rather than Fed. R. Civ. P. 12(b)(6), and therefore the court will address the motion in accordance with the former provision.

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis supplied). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921).  *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

**PART ONE**

*Statement of Relevant Facts*

**A.    Background**

This is a retaliation action brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.[3]  The plaintiff, Evelyn Knight, is a Hispanic female who was employed at the United States Army Central Reservation Center ("ACRC"), located on Redstone Arsenal in Huntsville, Alabama, from late 1996 until sometime in early 2004.[4]  The ACRC is akin to a commercial call center that handles travel accommodations for military personnel.[5]  As a "Reservation

---

[3] Doc. no. 1 (Complaint), ¶ 4.  ***Nota bene:***  the complaint initially contained a claim for hostile work environment, but plaintiff conceded that cause of action in responding to summary judgment.  *See* doc. no. 42 (Plaintiff's Brief in Opposition to Summary Judgment), p. 3. Accordingly, the Secretary's motion is due to be granted summarily insofar as it seeks dismissal of Count V of the complaint.

[4] Doc. no. 33 (Defendant's Brief in Support of Summary Judgment), Statement of Undisputed Facts, ¶¶ 5; doc. no. 1, ¶ 29; doc. no. 15 (Answer), ¶ 29.

[5] *See* doc. no. 39 (Plaintiff's Evidentiary Submission, Volume 1), Ex. 15 (Declaration of Angela Morrow), p. 167; *id.* at Ex. 3 (Deposition of Marie Harrison Morris), p. 6, lines 12-19.

Agent" throughout her tenure at ACRC,[6] Knight's duties were to "book military travel worldwide for PCS [*i.e.*, Permanent Change of Station orders], leisure and space available accommodations."[7]

From 1996 to 1999, Knight's immediate supervisor was Maudine ("Dean") Curry.[8]  While Ms. Curry was in charge, Knight apparently performed her duties competently,[9] did not require any "written counseling" for acting out of line,[10] and received at least one "On the Spot Award," a commendation given for "unusual or exceptional work."[11]  Knight's post-1999 performance record is a mixed bag.  On the one hand, Knight continued to receive positive feedback from the time Curry ceased being her supervisor in 1999, up through early to mid-2002.  Indeed, both of Knight's performance evaluations issued between April 1, 2000 and March 31, 2002 rated her "Excellent."[12]  She also received several more "On the Spot Awards" and performance-based pay increases and bonuses during or shortly after that period.[13]

---

[6] Doc. no. 33, Statement of Undisputed Facts, ¶ 6.  The parties sometimes refer to Knight's position as "Reservation Clerk."

[7] Doc. no. 39, Ex. 1 (Deposition of Evelyn Knight), p. 20, lines 15-18.

[8] Doc. no. 42, Statement of Undisputed Facts, ¶¶ 64-65.

[9] *Id*. at ¶ 247 ("Ms. Curry considered Knight a capable employee.").

[10] *Id*. at ¶ 246.

[11] *Id*. at ¶¶ 250, 252.

[12] *Id*. at ¶¶ 263, 265.

[13] *Id.* at ¶¶ 253-263, 265, 276.

On the other hand, Knight received her first "written counseling" on July 15, 2002,[14] and was required to meet with management about allegations of insubordination on September 10, 2002.[15]

Knight contends that there is a connection between these (and other) remedial actions and the fact that, earlier that year, she had begun participating in protected Equal Employment Opportunity ("EEO") activities related to ACRC.[16]   Knight initiated her own EEO complaints, or filed documents in support of another employee's EEO complaint, on four occasions; she claims that four adverse employment actions are attributable to this activism.[17]

**B.   Knight's First Three EEO Filings**

Knight's first EEO activity occurred in February 2002,[18] after she had been on

---

[14] Doc. no. 33, Statement of Undisputed Facts, ¶ 12.  This admonishment arose out of Knight's decision to fax an interoffice memorandum with several hand-written questions to a contract officer in Washington, D.C., rather than seeking answers to her inquiries through the established "chain of command."  *Id*.  *See also generally* doc. no. 39, Ex. 1, p. 84, line 6 - p. 88, line 20.

[15] *E.g.*, doc. no. 39, Ex. 1, p. 83, lines 17-25.

[16] To be very clear, *these two* remedial actions are *not* the ones that Knight complains about in this lawsuit.  She evidently does feel that the July 15, 2002 counseling and September 10, 2002 meeting were retaliatory in nature, but the alleged adverse employment actions that Knight believes violated federal law took place in 2003, and are described below.  The 2002 events are nonetheless important:  Knight implies that they indicate a slow but steady escalation of retaliatory sentiment, ultimately culminating in the actions for which she now seeks relief; the Secretary points to them as evidence that Knight was an increasingly difficult employee whose repetitive misconduct provides a legitimate, nondiscriminatory reason for the more serious remedial actions at issue here.

[17] *See* doc. no. 42, p. 34.

[18] *Id*. at Statement of Undisputed Facts, ¶ 77.

the listening end of a conversation in which a supervisory employee, Yvonne Bowden, revealed that another ACRC employee, Donna Harrison, was soon to be terminated.[19]  Knight felt it was wrong for Bowden to discuss Harrison's termination before informing Harrison of her fate; thus, when Harrison announced that she would be filing an EEO complaint, Knight agreed to, and did, write a letter supporting her claim of discrimination.[20]  On March 8, 2002, Knight revealed her EEO participation to one of her superiors,[21] ACRC Manager Angela Morrow.[22]  The record does not reveal any immediate repercussions flowing from that disclosure, but Knight apparently considers it significant in light of subsequent events.

Yvonne Bowden became Knight's "first-line," or immediate, supervisor in June 2002.[23]  Shortly thereafter, in July 2002, Knight filed her own informal EEO complaint, asking the Department of the Army to investigate whether she had been subjected to sexual harassment and a hostile work environment by other employees.[24] This was the first EEO filing that Knight initiated on her own, but her second

---

[19] Doc. no. 39, Ex. 1, p. 23, lines 10-16.

[20] Doc. no. 33, Statement of Undisputed Facts, ¶ 9.  *See also* doc. no. 39, Ex. 1, p. 24, lines 19-22.

[21] Doc. no. 33, Statement of Undisputed Facts, ¶ 10.

[22] *Id*. at ¶ 8.

[23] *Id*. at ¶ 7.

[24] *Id*. at ¶¶ 17-19.

overall.[25]  In any event, she voluntarily dismissed the complaint after discussing the matter with Morrow on August 9, 2002.[26]  Just over a month later, however, on September 18, 2002, Knight filed a new informal EEO complaint — followed by a formal complaint on October 3, 2002 — this time alleging that Bowden was treating her unfairly.[27]  The crux of this filing (her second as a complainant, and third overall) was that Bowden had ordered Knight and another employee to move their office spaces from one side of the building to the other.[28]  Knight felt the move was Bowden's attempt to retaliate against her for supporting Donna Harrison's EEO complaint the previous March and, further, that it evidenced a racially hostile work environment.[29]

The record does not reveal precisely when each supervisory official at ACRC

---

[25] Doc. no. 42, Statement of Undisputed Facts, ¶ 80.

[26] Doc. no. 33, Statement of Undisputed Facts, ¶ 20; doc. no. 42, Statement of Undisputed Facts, ¶ 112; doc. no. 39, Ex. 1, p. 28, line 12, p. 29, line 22; doc. no. 39, Ex. 4 (Deposition of Angela Morrow), p. 26, line 8 - p. 27, line 22.

[27] Doc. no. 33, Statement of Undisputed Facts, ¶ 23-26; doc. no. 42, Statement of Undisputed Facts, ¶¶ 82, 84, 86.  *See also* doc. no. 39, Ex. 1, p. 32, lines 2-22.

[28] *See, e.g.*, doc. no. 33, Statement of Undisputed Facts, ¶ 25; doc. no. 39, Ex. 1, p. 32, lines 2-10.  Incidentally, there is evidence in the record indicating that Bowden only ordered this move in response to *Morrow's* directions, and also that the move affected a number of ACRC employees, not just Knight and one other individual.  *See, e.g.*, doc. no. 34 (Defendant's Evidentiary Submission), Ex. 13 (Declaration of Angela Morrow), pp. 167-169.  Knight does not base her complaint upon this adverse action, however.  Therefore, the court merely points out these differing versions of the facts, and does not attach any significance to the dispute.

[29] Doc. no. 39, Ex. 1, p. 32, lines 12-22.  *See also* doc. no. 42, Statement of Undisputed Facts, ¶ 87.

received notice of the September 18, 2002 filing, but Morrow testified that she would have been aware of it at least by October 16, 2002, because she was interviewed about it by an EEO counselor on that date.[30]   Debbie Martin, who was Morrow's supervisor and served as the deciding official on some personnel matters involved in this case,[31] apparently was not deposed.   Nonetheless, Morrow testified that she would have notified Martin of Knight's EEO filing within a day or two of the time when she herself learned of it, as was her practice.[32]   Bowden, for her part, indicated in her deposition that she was unable to recall virtually *any* of the dates at issue in this case.[33]   The best she could do was state that she would have been aware of Knight's "EEO activity" as of January 17, 2003, because that was when she attended some

_____

[30] Doc. no. 39, Ex. 4, p. 50, line 5 - p. 51, line 10.   *See also* doc. no. 42, Statement of Undisputed Facts, ¶¶ 114-115; doc. no. 41 (Plaintiff's Evidentiary Submission, Volume 2), Ex. T (Summary of Morrow's EEO Interview), p. 11 (indicating that the charge under investigation at the time of the interview was that "the change in seat assignment was based on race").   Further, Morrow acknowledged being aware of Knight's informal EEO complaint filed on September 18, 2002, "within a few days of Ms. Knight having brought [the complaint] to the informal complaint EEO office counselor."   Doc. no. 39, Ex. 4, p. 95, line 16 - p. 96, line 11 (quotations come from attorney's question, to which Morrow responded, "Correct").

[31] Doc. no. 33, Statement of Undisputed Facts, ¶ 13; doc. no. 39, Ex. 4, p. 53, lines 7-20; doc. no. 39, Ex. 1, p. 91, lines 13-17.

[32] Doc. no. 42, Statement of Undisputed Facts, ¶ 107; doc. no. 39, Ex. 4, p. 53, line 18 - p. 54, line 13.   Despite not being deposed, Martin did respond to interrogatories, and the parties have stipulated she agrees with Morrow's statement that she was typically made aware of EEO complaints by Morrow within a few days after Morrow was informed of those issues.   *See* doc. no. 42, Statement of Undisputed Facts, ¶ 109.

[33] Doc. no. 39, Ex. 6 (Deposition of Yvonne Bowden), p. 17, lines 14-21.

unspecified EEO fact-finding hearing.[34]  Importantly, Bowden did not state *which* of Knight's "EEO activit[ies]" she would have been aware of on that date, nor did she represent that this was the first she had heard of Knight's EEO filings.  (Notably, the precise question asked did not call for that sort of specific response.[35])  While Knight attempts to proffer this testimony as evidence that Bowden first became aware of her EEO activities in January of 2003,[36] an EEO Counselor's Report dated October 23, 2002 indicates that Bowden was interviewed regarding Knight's September 18, 2002 filing within a month thereof.[37]

---

[34] *Id*. at p. 17, line 22 - p. 18, lines 3-11.

[35] To the contrary, Bowden was only asked to state whether January 17, 2003 "would have been at a time you would have been aware of [Knight's] EEO activity." *Id*. at p. 18, lines 8-10.  The questioner did not follow up by inquiring whether, and Bowden did not state that, this was the first time she became aware of the EEO filings.  *See id*.

[36] *See* doc. no. 42, p. 41.

[37] *See* doc. no. 51 (Defendant's Supplemental Response), Ex. 1 (EEO Counselor's Report), p. 2.  *Cf*. doc. no. 42, Statement of Undisputed Facts, ¶¶ 114-115 (noting that Morrow was interviewed by an EEO counselor on October 16, 2002).  The court recognizes that the operative sentence in the EEO Counselor's Report is somewhat sloppily drafted, but the drafting does not appear to place in doubt the central inference to be drawn therefrom:  *i.e.*, that the EEO counselor interviewed both Angela Morrow and Yvonne Bowden concerning Knight's September 18, 2002 informal EEO complaint shortly after that complaint was filed.  Recounting the interview, the EEO counselor writes:

> I[n] conversation with the management official (Ms. Morrow and Ms. Bowden regarding the aggrieved request to be seated by a window it would be inappropriate for them to not have physical access to her.

Doc. no. 51, Ex. 1, p. 2 (stray parenthesis in original).  As can be seen, any ambiguity in the sentence is attributable primarily to the *singular* use of the term "management official" followed immediately by an opening parenthesis and *two* names, Ms. Morrow and Ms. Bowden, with no closing parenthesis.  Presumably, the omitted closing parenthesis belongs after Ms. Morrow's name.

## C.    First Two Adverse Employment Actions[38]

Pinpointing the date on which Bowden became aware of Knight's EEO activities is critical because Knight contends that Bowden took adverse employment actions against her in retaliation for those activities.[39]  The first allegedly adverse action did not occur until March 24, 2003, when Bowden issued Knight a letter of reprimand, dated March 10, 2003.[40]  The events giving rise to the letter actually extend back to February 12, 2003,[41] a date on which Bowden was absent from ACRC on leave.[42]

---

Working on that reasonable assumption, the sentence would indicate that the EEO counselor interviewed "the management official (Ms. Morrow) and Ms. Bowden."  *Cf. id.*

Notably, the court has examined the exhibits proffered by Knight for the purpose of negating the inference raised by this piece of evidence, but simply does not see how any of these exhibits accomplish the stated objective.  *See* doc. no. 52 (Plaintiff's Supplemental Response).  Said more directly, these exhibits do not provide any evidence that Bowden learned of Knight's September 18, 2002 EEO activity any later than October 23, 2002.

[38] The court titles this section, in part, "Adverse Employment Actions" *not* because it is undisputed that the actions described herein were sufficient to alter the terms and conditions of Knight's employment, but because Knight *contends* that they were.  In fact, the Secretary disputes that either of these actions were sufficiently adverse to alter the terms and conditions of Knight's employment, but the merits of that position belong in the court's substantive discussion, which appears below.

[39] Doc. no. 42, Statement of Undisputed Facts, ¶ 142.

[40] Doc. no. 33, Statement of Undisputed Facts, ¶ 30; doc. no. 39, Ex. 1, p. 39, lines 11-18; doc. no. 39, Ex. 1, p. 43, lines 11-14; doc. no. 41, Ex. K (Letter of Reprimand), pp. 1-2.  It is the Secretary's position that this letter of reprimand does not rise to the level of an "adverse employment action" under Title VII.  *See* doc. no. 44, p. 38.

[41] *See, e.g.*, doc. no. 42, Statement of Undisputed Facts, ¶ 141.

[42] *Id.* at ¶ 170.  *See also* doc. no. 39, Ex. 6, p. 38, lines 2-22.

-10-

In Bowden's absence, another supervisory employee, Margaret Lamb,[43] was responsible for overseeing Knight.[44]  Although the facts related to exactly what occurred are in dispute,[45] the gist of it is that Lamb confronted Knight and two other employees with allegations that each of them had been on personal phone calls during a high call volume period, thereby allowing multiple customer calls to go unanswered.[46]  The accounts of the confrontation between Lamb and Knight paint a picture of a somewhat heated exchange.  Several employees who were present testified that Lamb acted quite unprofessionally, even insolently.[47]  According to the letter of reprimand, Knight also "became angry and said [to Lamb], 'you're lying.  I take more calls than anyone here.  You look at my [phone] reports and it's none of your business who I talk too [sic].  My personal calls are my business.'"[48]  Knight disputes the assertion that she personally became angry, but admits telling Lamb that she was lying, and also that she should be more concerned about another employee

[43] Doc. no. 42, Statement of Undisputed Facts, ¶ 68.  *See also* doc. no. 39, Ex. 5 (Deposition of Margaret Lamb), p. 6, lines 1-5.

[44] Doc. no. 39, Ex. 4, p. 79, lines 11-21.  *See also* doc. no. 42, Statement of Undisputed Facts, ¶ 164.

[45] Doc. no. 42, Statement of Undisputed Facts, ¶ 156.

[46] Doc. no. 33, Statement of Undisputed Facts, ¶ 35; doc. no. 42, Statement of Undisputed Facts, ¶¶ 143-144, 156.  *See also* doc. no. 39, Ex. 5, p. 25, lines 4-10; *id.* at p. 26, lines 1-7.

[47] Doc. no. 42, Statement of Undisputed Facts, ¶¶ 174, 176, 178, 181.

[48] Doc. no. 41, Ex. K (Letter of Reprimand), ¶ 2.  *See also* doc. no. 42, Statement of Undisputed Facts, ¶ 141.

who allegedly was taking her lunch break at the wrong hour.[49]  Knight's position is that she did not make or receive any personal calls, and was being singled out for unfounded criticism.[50]  She notes it is undisputed that the ACRC's daily call report does not provide any proof that she was on personal calls.[51]

In any event, when Bowden returned from leave, she investigated the episode and credited Lamb's version of the facts.[52]  Specifically, Bowden decided a reprimand was appropriate, "because [Knight] was insubordinate to Ms. Lamb."[53]  Bowden also decided that Knight "was probably doing what was said she was doing," *i.e.*, taking or making personal phone calls.[54]  She accordingly issued Knight the above-mentioned letter of reprimand, which warned:  "In the event that your conduct does not improve, any further display of this or similar conduct will result in more severe disciplinary action taken against you, up to and including your removal from employment."[55]  (Although Lamb could have initiated disciplinary action based on

---

[49] Doc. no. 39, Ex. 1, p. 53, lines 1-6.  Knight also disputes saying that her personal calls were her business.  *See id*. at lines 7-25.

[50] Doc. no. 42, Statement of Undisputed Facts, ¶¶ 144, 148.

[51] *Id*. at ¶¶ 159, 162-163.

[52] Doc. no. 39, Ex. 6, p. 40, lines 8-19; *id*. at p. 62, line 20 - p. 63, line 19.

[53] *Id*. at p. 61, lines 13-14.  *See also id*. at p. 68, lines 1-6.

[54] Doc. no. 39, Ex. 6, p. 58, lines 4-11.  *But see id*. at p. 99, lines 3-11 (stating that the reason for the reprimand was insubordination, not allegations of taking personal calls).

[55] Doc. no. 41, Ex. K, ¶ 4.  Bowden testified that she also took disciplinary action against one of the other employees who was involved in the phone call controversy.  Doc. no. 39, Ex. 6, p. 39, line 15 - p. 40, line 7.

her own perceptions of the February 12 event,[56] she apparently did not do so, and had

no part in the decision to issue the letter.[57])

On the same day that Knight received the letter of reprimand — March 24,

2003 — another confrontation took place.[58]  It all started when Knight found a note

on her desk from a co-worker, Marie Harrison, asking Knight to stop monitoring her

(Harrison's) time and attendance records.[59]  Offended, Knight approached Harrison

and the two began arguing.[60]  This evidently created a major disturbance in the office,

and Bowden was forced to intervene verbally, requesting that the two separate and

calm down.[61]  Although Bowden did not recommend any disciplinary action against

either Knight or Harrison,[62] Morrow met with both of them to discuss the encounter.[63]

Morrow advised Knight and Harrison that this was an interpersonal matter that

needed to be resolved without managerial intervention, but did eventually provide

---

[56] Doc. no. 42, Statement of Undisputed Facts, ¶ 164.

[57] Doc. no. 39, Ex. 5, p. 67, lines 1-9.

[58] Doc. no. 33, Statement of Undisputed Facts, ¶ 37.

[59] *Id*. at ¶¶ 38-39.

[60] Doc. no. 33, Statement of Undisputed Facts, ¶ 40; doc. no. 42, Statement of Undisputed Facts, ¶ 195.

[61] Doc. no. 39, Ex. 3 (Deposition of Marie Harrison), p. 9, lines 5-19; doc. no. 41, Ex. L (Notice of Proposed Ten Day Suspension), ¶ 2 (alleging that "Yvonne Bowden [] heard the commotion and instructed both you and Ms. Harrison to stop immediately").

[62] Doc. no. 42, Statement of Undisputed Facts, ¶ 191.

[63] Doc. no. 33, Statement of Undisputed Facts, ¶ 41.

Harrison a written warning.[64]  Knight was not satisfied with the state of things, however, and requested permission from Morrow to contact the Military Police because she felt Harrison had threatened her.[65]  Morrow refused that request.[66]

Nevertheless, the following morning, March 25, 2003, Knight proceeded to contact the Military Police.[67]  Officer Bill Gaines arrived at ACRC within a few minutes, along with Alex Ortiz of the Provost Marshal's Office.[68]  Gaines, Ortiz, Morrow, and Knight all met and discussed the problems giving rise to the situation.[69] According to Morrow, Knight refused to limit the conversation to her confrontation with Harrison, but repeatedly interjected, to mention unrelated employment issues, such as a complaint she had filed with the Inspector General's Office alleging a hostile work environment.[70] Morrow's overall impression of Knight's conduct during the meeting was that she was being "unprofessional,"[71] "disrespectful,"[72] and

---

[64] Doc. no. 42, Statement of Undisputed Facts, ¶¶ 204-205.  *See also* doc. no. 33, Statement of Undisputed Facts, ¶ 41.

[65] Doc. no. 42, Statement of Undisputed Facts, ¶ 206; doc. no. 33, Statement of Undisputed Facts, ¶ 42.

[66] Doc. no. 42, Statement of Undisputed Facts, ¶ 206; doc. no. 33, Statement of Undisputed Facts, ¶ 42.

[67] Doc. no. 33, Statement of Undisputed Facts, ¶ 46.

[68] *Id.* at ¶ 47; doc. no. 39, Ex. 12 (Statement of Alex Ortiz), p. 1.

[69] Doc. no. 42, Statement of Undisputed Facts, ¶¶ 212, 213, 218.

[70] Doc. no. 39, Ex. 4, p. 33, lines 14-19; *id.* at p. 40, lines 9-19; *id.* at p. 42, lines 1-10.

[71] *Id.* at p. 33, line 16.

[72] *Id.*

-14-

"belaboring the point that my manager never does anything [to respond to complaints]."[73]  Interestingly, neither Gaines nor Ortiz shared Morrow's perception.[74] "According to [Officer] Gaines, Knight appeared to have a genuine . . . concern[.]"[75] In any event, Gaines explained that he perceived no criminal activity, expressed his opinion that this was an issue that could be handled internally, and apparently left the building.[76]

It just so happened that the closing date for management's yearly evaluation of Knight's work performance fell a few days after the foregoing incident.[77]  To be exact, the review period ran from April 1, 2002, to March 31, 2003.[78]  Bowden and Morrow were charged with the duty of evaluating Knight, and their signatures appear

---

[73] *Id*. at p. 42, lines 7-10.

[74] Doc. no. 42, Statement of Undisputed Facts, ¶¶ 218-219, 226.  The court notes that the Secretary has responded to Knight's Proposed Undisputed Fact ¶ 226 (proposing that Ortiz did not observe anything derogatory about Knight's remarks) with an objection on the ground that it is a "hearsay statement."  *See* doc. no. 44, p. 23.  The Secretary makes no effort whatsoever to explain why this fact, which is drawn from a sworn, handwritten statement signed by Ortiz and apparently kept on file with the Department of the Army, does not fall within an exception to the hearsay rule, such as the so-called "business records exception."  *See* Fed. R. Evid. 803(6).  In the absence of some explanation on this point, the court is not prepared to sustain the objection.  Moreover, as observed by the Secretary, the statement is not a crucial piece of evidence, and consideration of it does not affect the court's analysis.

[75] Doc. no. 42, Statement of Undisputed Facts, ¶ 221.

[76] *Id*. at ¶ 228; doc. no. 33, Statement of Undisputed Facts, ¶ 47.

[77] Doc. no. 42, Statement of Undisputed Facts, ¶ 267.

[78] *Id*.

-15-

on her evaluation form, with dates of April 24 and 28, 2003, respectively.[79]  The form allows evaluators to select one of five ratings that best describes the employee's performance over the past year.  From highest to lowest, those ratings are as follows: "Outstanding"; "Excellent"; "Satisfactory"; "Minimally Satisfactory"; and "Unsatisfactory."[80]  A rating of "Excellent" or higher entitles an employee to a cash award, and may result in a performance-based pay adjustment.[81]  As mentioned above, Knight's two previous evaluations ranked her performance as "Excellent"; this time, however, she received a rating of "Satisfactory."[82]

There is no explanation on the form itself as to why this particular ranking was selected, but Bowden testified during her deposition that it was based on information recorded in a spreadsheet, which allegedly indicated "various" work performance problems, including that "[Knight] wasn't picking up calls."[83]  Bowden did not further elaborate on the specific work performance issues she observed, but did testify

---

[79] Doc. no. 34, Ex. 16 (Annual Performance Evaluation for 2002-2003).  Knight received the evaluation and signed it to indicate receipt on April 24, 2003.  *See id*.  *See also* doc. no. 42, Statement of Undisputed Facts, ¶ 268.

[80] Doc. no. 34, Ex. 16.

[81] Doc. no. 42, Statement of Undisputed Facts, ¶¶ 272-273.  As for the impact of the evaluation on a performance-based pay adjustment, Bowden testified that "you don't know whether or not you'll get a cash award.  I mean, [the evaluation] plays [a role in determining] whether you get cash and sometimes . . . a raise, a percentage toward your pay or cash."  Doc. no. 39, Ex. 6, p. 20, line 21 - p. 21, line 1.

[82] Doc. no. 42, Statement of Undisputed Facts, ¶ 267.  *See also* doc. no. 33, Statement of Undisputed Facts, ¶ 49.

[83] Doc. no. 42, Ex. 6, p. 28, lines 4-21.  *See also* doc. no. 39, Ex. 6, p. 23, lines 1-12.

that disciplinary problems also could affect an employee's rating.[84]  This is critical,

as Knight has stated that she believes the evaluation should be based on how she does

her job and nothing else.[85]  It is also important because, during the relevant time

frame, Knight had been counseled for inappropriate use of the chain of command,

conferred with management over allegations of insubordination, received a letter of

reprimand, and engaged in the confrontation with Harrison.[86]  (Incidentally, Harrison

also received a "Satisfactory" performance evaluation.[87])  Whatever the basis, the

effect of the "Satisfactory" rating was that Knight did not receive a cash award or pay

increase.[88]  She contends that the rating constitutes an adverse employment action for

precisely that reason.

**D.     Knight's Fourth EEO Filing and Third Adverse Employment Action**

On May 5, 2003, Morrow presented Knight with a Notice of Proposed Ten Day

Suspension.[89]  Although more than a month had passed by that point, the suspension

was proposed as punishment for Knight's behavior in a meeting, described above,

---

[84] Doc. no. 39, Ex. 6, p. 98, lines 8-21.

[85] Doc. no. 33, Statement of Undisputed Facts, ¶ 51.

[86] *See*, *e.g.*, *id*. at ¶ 50.

[87] *Id*. at ¶ 52.

[88] Doc. no. 42, Statement of Undisputed Facts, ¶¶ 271, 275.

[89] *Id*. at ¶ 186.  For what it is worth, Knight is careful to point out that Morrow was still aware of Knight's participation in protected EEO activities as of the date that she proposed the ten day suspension.  *Id*. at ¶ 110.

that took place one day after the Harrison incident on March 24, 2003.[90]  According to Morrow, however, "Knight's suspension was not the [direct] result of what happened with Ms. Harrison."[91]  Nor was Knight being suspended because she called the military police on March 25, 2003.[92]  Rather, Morrow testified that "the number one fact was her discourtesy and disrespect in the meeting with [Officer] Gaines and [Alex Ortiz of the Provost Marshal's Office]," on March 25.[93]  As explained above, Morrow was referring to how Knight brought up an unrelated Inspector General complaint and allegedly made derogatory statements about Morrow to Gaines and Ortiz.[94]  On May 21, 2003, Debbie Martin advised Knight that the proposed suspension was being adopted and implemented.[95]

On May 14, 2003 — seven days *prior* to the date on which Martin implemented the suspension, but nine days *after* learning of the fact that it had been proposed by Morrow — Knight initiated contact with the Department of the Army's EEO Office and lodged a third informal EEO complaint.[96]  In the formal complaint

---

[90] *Id*. at ¶ 187.

[91] *Id*. at ¶ 200.  *See also id*. at ¶ 192.

[92] *Id*. at ¶ 208.

[93] Doc. no. 39, Ex. 4, p. 38, lines 3-11.  *See also* doc. no. 42, Statement of Undisputed Facts, ¶ 212.

[94] Doc. no. 39, Ex. 4, pp. 40-42.  *See also* doc. no. 41, Ex. L, ¶ 2.

[95] Doc. no. 42, Statement of Undisputed Facts, ¶ 188.  *See also* doc. no. 41, Ex. M (Notice of Ten Day Suspension).

[96] Doc. no. 42, Statement of Undisputed Facts, ¶ 85.

-18-

that followed on June 22, 2003, she asked for investigation into the proposed suspension itself (which by that time had been implemented), in addition to the letter of reprimand and the "Satisfactory" performance appraisal.[97]

The information on file with the court does not clearly reveal when relevant ACRC supervisors became aware of this particular instance of EEO activity by Knight.[98]  On the one hand, there is a memorandum dated May 12, 2003, in which Morrow acknowledges being approached by Knight on that same day with a request for copies of "counseling statements" that "she was seeking to take to the EEO office for her case."[99]  At one point, counsel for the Secretary suggests this is evidence that Morrow learned of Knight's third informal complaint on May 12, 2003.[100] Considering the cryptic nature of the statement in the memorandum, however, together with the fact that the informal complaint was not even filed with the Department of the Army until two days *later*, on May 14, the court is hesitant to accept such an inference.  On the other hand, in answers to interrogatories, Morrow

---

[97] *Id*. at ¶¶ 91-92.  The Department of the Army formally accepted this complaint for investigation on October 10, 2003.  *Id*. at ¶ 90.

[98] This is a problem throughout the record.  Many proposed statements of undisputed fact simply refer to certain individuals being "aware of Knight's EEO activity" at specified times, without explaining *which* of Knight's four separate EEO filings is at issue, or whether the referenced instance of awareness is the *first* such instance.  *See, e.g.*, *id*. at ¶¶ 110-120.

[99] Doc. no. 41, Ex. S (Morrow Memorandum).

[100] *See* doc. no. 44, Objection to Proposed Fact ¶ 122.

indicated that she is not sure when she became aware of the informal complaint, but would have been aware of it "[a]t the latest . . . when EEO sent her a request for information on June 2, 2003."[101] Therefore, viewing the evidence in the light most favorable to Knight, the court will assume that Morrow learned of this EEO filing on or about June 2, two to three weeks after it was first lodged.[102]

Since Martin was not deposed, there is no testimony from her indicating when *she* learned of Knight's May 14, 2003 EEO activity.  However, the parties' general understanding of Martin's awareness is that she

> does not have personal recall of when she learned of each protected activity by Knight.  Her only source of information on Knight's EEO activity came from Manager Morrow.  Manager Morrow [in turn] states that she would notify M[s]. Martin either the same day she found out o[r] within a day or two of learning of an EEO complaint.[103]

Accordingly, in the absence of any more specific evidence, it stands to reason that Martin first learned of Knight's May 14, 2003 EEO activity in early June, 2003.

## E.    Fourth Adverse Employment Action and Knight's Attempted Amendment

---

[101] Doc. no. 43, Ex. D (Secretary's Response to Interrogatories), p. 2, # 6.

[102] The court so concludes because the later June 2 date has more evidentiary support and also is more helpful for Knight for most purposes — it reduces, albeit slightly, the temporal gap between knowledge of protected activity and a subsequent adverse action.  However, as discussed below, Knight appears to rely on the *earlier*, May 12 date in attempting to bolster *one* of her arguments for causation.  *See* Part II-A-3(a), *infra*.  Accordingly, for purposes of that argument only, the court will assume that Morrow learned of this protected activity on May 12, even though no informal complaint was filed until May 14.  *See id*.

[103] Doc. no. 42, Statement of Undisputed Facts, ¶ 109.

The final disciplinary action Knight complains about arose out of events transpiring on the afternoon of Friday, July 18, 2003.[104]  According to her, standard office procedure is "to take a 15 minute break whenever the time is available."[105] Knight's personal practice was to take her afternoon break at the same time every Friday following her lunch period, apparently around 2:00 p.m.[106]  On the day in question, she acted in accordance with this practice, and told Bowden she was taking her break as she left her work station.[107]  According to Knight, Bowden did not say anything to her at that time.[108]  Within five minutes, however, Bowden approached Knight and told her that she needed to return to work because another employee had not had an opportunity to take her break, and Knight had just returned from lunch an hour before.[109]  Knight stated "I guess I'm not Marie," referring to a co-worker who Knight contends is allowed to take breaks whenever she desires.[110]  Bowden

---

[104] *Id*. at ¶ 231; doc. no. 33, Statement of Undisputed Facts, ¶ 61 (*Nota bene:*  because the Secretary's motion has two paragraphs numbered "59," Knight's response admitting this fact is numbered "62").  *See also* doc. no. 41, Ex. N (Notice of Proposed Fourteen Day Suspension), ¶ 2.

[105] Doc. no. 39, Ex. 1, p. 113, line 25 - p. 114, line 3.

[106] Doc. no. 42, Statement of Undisputed Facts, ¶¶ 233, 234, 236.

[107] *Id*. at ¶ 235.

[108] Doc. no. 39, Ex. 1, p. 114, lines 18-19.

[109] Doc. no. 33, Statement of Undisputed Facts, ¶¶ 56-57.

[110] *Id*. at ¶ 59 (*Nota bene:*  this is the first paragraph numbered "59" in the Secretary's Statement of Undisputed Facts).  Knight testified that she made the remark to several other co-workers sitting near her, not to Bowden specifically.  Doc. no. 39, Ex. 1, p. 117, lines 1-4.

reportedly turned around and implored, "let's not go there,"[111] though she later testified that she didn't consider Knight's comment a "personal affront."[112]

Following Bowden's directions, Knight returned to her desk.[113] Approximately fifteen minutes later, Bowden telephoned Knight — intending to tell her that she was free to take her break, because the other employee had returned to duty.[114] Although the parties disagree as to Knight's rationale for doing so, she apparently did not answer the telephone. Knight testified that, because her desk was close to Bowden's, she leaned back in her chair, made eye contact, and verbally told her that she did not want to take a break at that point, since she was scheduled to leave work at 3:00 p.m.[115] In any case, after the call went unanswered Bowden walked over to Knight and asked her why she was "ignoring" her telephone calls.[116] There is a dispute as to how Knight responded. Knight claims that she told Bowden she had ignored the call only because she had already communicated the fact that she did not need a break; Bowden later wrote, however, that Knight simply answered her question with a curt

---

[111] Doc. no. 42, Statement of Undisputed Facts, ¶ 231.

[112] Doc. no. 39, Ex. 6, p. 88, lines 1-3. *See also* doc. no. 42, Statement of Undisputed Facts, ¶ 244.

[113] Doc. no. 42, Statement of Undisputed Facts, ¶ 237.

[114] Doc. no. 33, Statement of Undisputed Facts, ¶ 59 (*Nota bene:* this is the second paragraph numbered "59" in the Secretary's Statement of Undisputed Facts).

[115] Doc. no. 39, Ex. 1, p. 117, lines 5-24.

[116] Doc. no. 42, Statement of Undisputed Facts, ¶ 231.

"Yep."[117]

In any event, the fact that Knight did not pick up the telephone did not, standing alone, convince Bowden to take disciplinary action.[118]  To the contrary, Bowden also considered a note that she received from Knight that same afternoon in deciding to pursue remedial action.[119]  The note has been submitted as evidence, and Knight apparently has no objection to the court considering it, at least for the non-substantive purpose of gauging its probable effect on the recipient's state of mind. In the note, Knight advises Bowden that, "before you point the finger telling me I'm acting unprofessional take a look at yourself.  Your [sic] very tackey [sic] and unprofessional."[120]   Knight also wrote, "[w]hat you did was inappropriate," and closed by stating that "I've tr[i]ed to work with you . . . and it's clear we need to keep our conversations job related only."[121]

Considering this note, the comments surrounding the break ordeal, and all previous disciplinary actions that had been taken against Knight over the preceding year, Bowden proposed a fourteen day suspension.[122] She issued Knight notice of the

---

[117] *Id.*

[118] Doc. no. 39, Ex. 6, p. 86, lines 12-17; *id.* at p. 93, lines 15-18.

[119] Doc. no. 33, Statement of Undisputed Facts, ¶ 61.

[120] Doc. no. 34, Ex. 17 (Note from Knight to Bowden).

[121] *Id.*

[122] Doc. no. 42, Statement of Undisputed Facts, ¶ 230; doc. no. 41, Ex. N, ¶ 4(a) - (d).

proposed suspension on September 24, 2003, and the proposal was adopted and implemented by Angela Morrow on November 13, 2003.[123]  Knight has contended all along that this adverse action was taken in retaliation for her previous EEO activity. On November 19, 2003, just a few days after the imposition of the suspension, she requested an amendment to her most recent EEO charge of discrimination (initiated informally on May 14, 2003, and formally on June 22, 2003) to include allegations that the suspension was a reprisal for her participation in protected activity.[124]  On December 12, 2003, the Department of the Army accepted the amendment, but reversed course a few months later, notifying Knight (erroneously) that this claim had already been investigated during the summer of 2003.[125]  Obviously, that claim had *not*, and could not have, been investigated at that time, because the incident did not arise until late fall of 2003.  Although the Secretary originally argued that Knight failed to exhaust her administrative remedies due to this acceptance and subsequent rejection of her amendment, he has conceded in his reply brief that Knight did everything she could to exhaust, and that it was the Army that failed to perform a full investigation.[126]

---

[123] Doc. no. 42, Statement of Undisputed Facts, ¶¶ 230, 232.  *See also* doc. no. 41, Ex. O (Notice of Fourteen Day Suspension).

[124] Doc. no. 42, Statement of Undisputed Facts, ¶¶ 135-136.

[125] *Id*. at ¶ 139.

[126] Doc. no. 44, p. 34.

One final note:  Knight does not explicate exactly which of her supervisors (*i.e.*, Morrow or Bowden) she believes orchestrated this allegedly discriminatory suspension.  At the time of the *proposed* suspension, Morrow would have known of Knight's most recent May 14, 2003 EEO activity for slightly more than three months.[127]  At the time of the actual implementation, Morrow would have been aware of that same activity for just over five months.  Knight is quick to point out, however, that Morrow would have been *reminded* of this complaint sometime around October 10, 2003, because that was the date on which the Department of the Army forwarded notice of acceptance of this charge for investigation.[128]  Because the record does not reveal when (if ever) Bowden was made aware of Knight's May 14, 2003 EEO activity, it is impossible to state whether there was a close temporal connection between her knowledge of that protected activity and her proposal of Knight's fourteen day suspension.  On the other hand, "Bowden acknowledged being aware of Knight's prior EEO activity [at some point] prior to the proposed fourteen (14) day suspension,"[129] and she provided testimony concerning Knight's September 2002

---

[127] Doc. no. 43, Ex. D, p. 2, # 6.

[128] Doc. no. 42, Statement of Undisputed Facts, ¶ 105.

[129] *Id*. at ¶ 103.  Specifically, Bowden's testimony was that "[i]f it [the EEO activity] was prior to that [the suspension proposal], probably.  If I was a witness; then I would probably know at the time."  Doc. no. 39, Ex. 6, p. 97, lines 11-16.

EEO complaint on June 17, 2003.[130]

## F.    Knight's Theory of the Case

Based upon all of the above, Knight filed suit in this court on March 29, 2004.[131]   Excepting the hostile work environment count that Knight now has abandoned,[132] the complaint asserts four retaliation claims in four separate counts. Count I pertains to the March 24, 2003 issuance of the letter of reprimand; Count II involves the ten day suspension implemented on May 21, 2003; Count III concerns the fourteen day suspension handed down on November 13, 2003; and Count IV addresses the "Satisfactory" performance evaluation given to Knight on April 24, 2003.

In support of these claims, Knight relies on what she asserts is a close temporal connection between her participation in EEO activity and the imposition of punishment by management at ACRC.  She also notes that Morrow herself indicated, in the course of an interview with an EEO counselor concerning Knight, that "the constant presence of a threat of a [EEO] complaint is disruptive to the maintenance of a harmonious workplace."[133]  According to Knight, Morrow vocalized this opinion

---

[130] Doc. no. 42, Statement of Undisputed Facts, ¶ 104.

[131] Doc. no. 1.

[132] *See supra* n.3.

[133] Doc. no. 42, Statement of Undisputed Facts, ¶ 130.

to her in person as well, stating that the EEO complaints caused her problems and disrupted the office atmosphere.[134]  Additionally, Knight points to the testimony of Dean Curry — Knight's previous supervisor who had no authority over her during the time periods relevant to this case, and who played no role in any disciplinary action taken against Knight.[135]  Curry's non-involvement aside, she recalled warning Knight, some time around March of 2002, about possible consequences that could flow from constant opposition to perceived abuse by supervisors.[136]  Curry apparently did not base this advice on any specific conversations with Martin or Morrow; it was merely "a friendly effort to try and help [Knight,] because I felt she would definitely get in trouble and if she were getting in trouble with Ms. Martin it could lead to her termination."[137]

Finally, Knight cites the testimony of two of her co-workers, Cheryl Davis and Shkeler Atchison, as circumstantial evidence of her supervisors' discriminatory motives.  Both of these employees — neither of whom had any supervisory authority over Knight — provided affidavits in which they allege that, prior to 2002, Knight

---

[134] *Id*. at ¶ 129.

[135] *See, e.g.*, doc. no. 39, Ex. 2 (Deposition of Maudine Curry), p. 19, line 11 - p. 20, line 16; *id*. at p. 22, lines 10-18.

[136] *See id*. at p. 27 - p. 32.  *See also* doc. no. 42, Statement of Undisputed Facts, ¶¶ 132-133.

[137] Doc. no. 39, Ex. 2, p. 69, lines 2-11.

had a generally positive relationship with management.[138]  They go on, however, to allege that, after Knight began participating in EEO activities, "management" began "singling [her] out" for disciplinary actions.[139]  Atchison closes her affidavit by stating "Ms. Lamb told me that Ms. Angela Morrow told her that if she did not stay on Ms. Knight that it was her butt."[140]  Atchison does not clarify the context for this remark so as to give it any significance at all; in any event, the court agrees with the Secretary that it is double-hearsay and therefore not properly considered on summary judgment.  *See*, *e.g.*, *Rojas v. Florida*, 285 F.3d 1339, 1342 n.3 (11th Cir. 2002) (holding that "comments by low-level supervisors repeating management's discriminatory comments are inadmissible hearsay"); *Prichard v. Southern Company Services, Inc.*, 92 F.3d 1130, 1134 (11th Cir. 1996) (holding that inadmissible hearsay cannot be considered on summary judgment).

　　In the following Part of this opinion, therefore, the court discusses the

---

[138] *Id*. at Ex. 13 (Affidavit of Cheryl Davis), ¶ 8; *id*. at Ex. 14 (Affidavit of Shkeler Atchison), ¶ 12.

[139] *Id*. at Ex. 13, ¶ 8; *id*. at Ex. 14, ¶ 12.  The Secretary has objected to Knight's proposed facts that convey Davis's and Atchison's testimony, arguing that the statements are "inadmissible hearsay from a co-worker."  The Secretary also argues that these employees' subjective opinions are immaterial to summary judgment.  The court fails to see how the testimony of these employees as to their mere *perceptions* of Knight's general treatment at ACRC are excludable under the rule against hearsay, and the Secretary does not attempt to explain his rationale in so arguing.  For the record, to be hearsay, a statement must be an out of court assertion.  *See* Fed. R. Evid. 801(a), (c).  There is no such assertion here, only a recitation of out of court *observations*, which are perfectly admissible.

[140] Doc. no. 39, Ex. 14, ¶ 13.

substantive merits of Knight's claims in light of the admissible evidence and relevant law.

## PART TWO

### *Discussion of Knight's Claims*

As mentioned, Knight brings this lawsuit under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a).  Title VII was enacted primarily to eliminate workplace discrimination on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Congress recognized, however, that this high purpose could not be accomplished without a complementary prohibition on discrimination against employees simply because they utilize the tools provided in the statutory scheme to protect, or assist others in protecting, their rights.  *See*, *e.g.*, *Deravin v. Kerik*, 335 F.3d 195, 204 (2d Cir. 2003) (noting that "the primary purpose of Title VII's anti-retaliation clause is to maintain unfettered access to Title VII's remedial mechanisms").  Accordingly, Congress decreed that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

42 U.S.C. § 2000e-3(a).

-29-

Thus, "[r]etaliation is a separate violation of Title VII." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000).  Generally speaking, proving a *prima facie* case of discrimination under 42 U.S.C. § 2000e-3(a) requires a tripartite showing:  (1) the plaintiff engaged in statutorily protected activity; (2) she suffered some adverse employment action; (3) there is a causal linkage between the plaintiff's protected activity and the employer's decision to take adverse action.  *E.g.*, *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Gupta*, 212 F.3d at 587; *Olmsted v. Taco Bell Corporation*, 141 F.3d 1457, 1460 (11th Cir. 1998).

In the absence of direct evidence of retaliatory motive, the *McDonnell Douglas* burden shifting analysis applies to retaliation claims under Title VII.  *See Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006); *Berman v. Orkin Exterminating Company*, 160 F.3d 697, 701 (11th Cir. 1998).  This means that merely proving the three elements comprising the *prima facie* case is not sufficient to survive summary judgment.  On the contrary, "[i]f the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate reason for the adverse action."  *Hurlbert*, 439 F.3d at 1297.  If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is a pretext for retaliation.  *See id.*  In determining pretext, the court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that reasonable factfinder could find them unworthy of credence." *Silvera v. Orange County School Board*, 244 F.3d 1253, 1258 (11th Cir. 2001) (citation and internal quotation marks omitted).

## A.    Knight's *Prima Facie* Case

### 1.    Protected activity

The first element of the *prima facie* case — protected activity — is not in dispute. The parties agree that in February or March of 2002, Knight wrote a letter in support of a fellow employee's EEO complaint. *Cf. Van Richardson v. Burrows*, 885 F. Supp. 1017, 1023 (N.D. Ohio 1995) ("Plaintiff engaged in protected activity when he filed an affidavit in support of Kreuter's EEOC claim."). Further, Knight initiated her own informal EEO complaints with the Department of the Army on July 16, 2002, September 18, 2002, and May 14, 2003.[141] *See, e.g., Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002) (noting that Title VII protects those who file formal complaints and even those who informally complain to superiors or utilize internal grievance procedures); *Lockamy v. Truesdale*, 182 F. Supp. 2d 26, 37 (D.D.C. 2001) ("The plaintiff clearly engaged in a protected

---

[141] As observed above, the July 16, 2002 complaint was voluntarily abandoned. The other two complaints were formalized on October 3, 2002, and June 22, 2003, respectively. *See supra.*

activity . . . when he filed an informal complaint with the EEOC alleging that Mr. Hardin harassed him and discriminated against him."). Knight has therefore established the first element of her *prima facie* case.

### 2. Adverse employment action

Knight relies upon four allegedly adverse employment actions as proof of the second element of her *prima facie* case, one for each count of her complaint. Defendant concedes that two of them — the ten day suspension and the fourteen day suspension[142] — sufficiently altered the terms, conditions, or privileges of employment to meet the adverse employment action standard. *See*, *e.g.*, *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006); *Pollard v. Montgomery County*, 66 F. Supp. 2d 1218, 1228 n.11 (M.D. Ala. 1999) (holding that ten day suspension without pay constitutes adverse employment action). On the other hand, the Secretary disputes that a mere letter of reprimand, or a "Satisfactory" performance evaluation, can meet the "threshold level of substantiality" that Title VII's anti-retaliation provision requires. *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998). *See also Stavropolous v. Firestone*, 361 F.3d 610, 616-17 (11th Cir. 2004) (noting that in a retaliation case, adverse employment action "must either be an ultimate employment decision or else

---

[142] Counts II and III, respectively. *See* doc. no. 1.

must 'meet some threshold level of substantiality'") (internal citation omitted).[143]

### a.    The letter of reprimand

The general rule is that "[t]he reprimand of an employee does not constitute an

adverse employment action when the employee suffers no tangible harm as a result."

---

[143] The court pauses for a moment to acknowledge a somewhat curious argument that appears in the Secretary's brief in support of summary judgment. Citing an unpublished opinion, the Secretary explains "the Eleventh Circuit has held that the *Wideman* standard [for measuring adverse employment action] *does not apply* to federal employees, such as the [p]laintiff in this case." Doc. no. 33, p. 19 (emphasis in original). Quoting in part from the unpublished opinion, the Secretary clarifies, "[i]nstead, a federal employee must demonstrate discrimination in ''ultimate employment decisions such as hiring, granting leave, discharging, promotion, and compensating.'" *Id.* (quoting *Williams v. West*, No. 99-14939, 221 F.3d 1358 (11th Cir. June 19, 2000) (Table), at 5 (quoting, in turn, *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981)).

The court rejects reliance on *Williams* for a few simple reasons. First, although the Federal Rules of Appellate Procedure now provide that *newly issued* unpublished opinions may be cited, *see* Fed. R. App. P. 32.1, they are not binding precedent for subsequent Eleventh Circuit panels. *See United States v. Rodriguez*, 363 F.3d 1134, 1138 n.4 (11th Cir. 2004). Second, and relatedly, the published opinion that forms the basis for this Circuit's adverse employment action jurisprudence in the retaliation context, *Wideman*, flatly refuses to rely upon the Fourth Circuit case from which the *Williams* panel drew its rule, *Page v. Bolger*. Why? "[B]ecause it did not involve a case arising under 42 U.S.C. § 2000e-3(a). Instead, it involved a claim of denial of promotion under 42 U.S.C. § 2000e-16." *Wideman*, 141 F.3d at 1456 n.2. The difference in context was apparently quite significant to the panel deciding *Wideman*, and this court is in no position to bicker. *See, e.g.*, *Wallace v. Georgia Department of Transportation*, No. 06-13345, 2006 WL 3626967, at * 2 (11th Cir. Dec. 13, 2006) ("The Supreme Court made clear in [*Burlington Northern v. White*, ___ U.S. ___, 126 S. Ct. 2405 (2006)] that the standard defining adverse employment action in the context of [a] retaliation claim does not apply to a core Title VII discrimination claim.").

Not to belabor the issue, but this discussion would not be complete without noting that a more recent unpublished Eleventh Circuit opinion in a federal employee retaliation case does not draw *any* distinction between federal and private employees in discussing the adverse employment action standard. *See Cavicchi v. Secretary of the Treasury*, No. 04-10451, 2004 WL 4917357, at * 5 (11th Cir. Oct. 15, 2004) ("[T]o be considered an adverse employment action for purposes of Title VII's anti-retaliation provision, the action must *either* be an ultimate employment decision *or else must meet some threshold level of substantiality*.") (internal quotations and citation omitted) (emphasis supplied). In light of the reasoning in *Wideman* and *Cavicchi*, the court will not place any reliance upon *Williams*.

*Summerlin v. M & H Valve Company*,  167 Fed. Appx. 93, 97 (11th Cir. 2006) (citing, *inter alia*, *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001)). *See also*, *e.g.*, *Davis v. Town of Lake Park*, 245 F.3d 1232, 1241 (11th Cir. 2001) (holding that "courts are wisely reluctant to treat job performance memoranda as actionable under Title VII where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline"); *Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir. 2002) (holding that "formal criticisms or reprimands, without any additional disciplinary action such as a change in grade, salary, or other benefits, do not constitute adverse employment actions"); *Weeks v. New York State Division of Parole*, 273 F.3d 76, 86 (2d Cir. 2001) (same); *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001) (holding that written reprimands were insufficient to constitute adverse employment action where the plaintiff "was not demoted in title, did not have his work schedule changed, was not reassigned to a different position or location . . . , did not have his hours or work changed or altered in any way, and [] was not denied any pay raise or promotion as a result of these reprimands").

Knight does not appear to dispute that the letter of reprimand, in and of itself, was nothing more than a negative mark on her record.  *Cf. Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 94 (D.D.C. 2005) ("A reprimand that 'amounts to a mere scolding,

without any disciplinary action which follows, does not rise to the level of adverse action.'") (internal citation omitted).  It did not, in other words, *directly* result in a demotion, pay cut, or other tangible adverse consequence.  Knight, nevertheless, argues that the "facts of this case . . . demonstrate that the Letter of Reprimand was repeatedly referred to in an effort to justify [her] 10-day and 14-day suspensions."[144]  The Secretary apparently concedes this much.[145]  Going forward with her theory, Knight proposes that "the issuance of the Letter of Reprimand was merely the first step in an overall scheme that would eventually lead to . . . termination of employment."[146]  This position finds some support in the case law of other circuits.  *See*, *e.g.*, *Nye v. Roberts*, 145 Fed. Appx. 1, 6 (4th Cir. 2005) ("[A] reasonable jury could find that, in the context of the Board's system of progressive discipline, the reprimand and performance evaluation resulted in a material change in Nye's employment status. . . . Dr. Carmean's formal letter of reprimand and Nye's downgraded performance evaluation thrust Nye further along the discipline track and closer to termination.").  *Cf. Medina v. Income Support Division*, 413 F.3d 1131, 1137 (10th Cir. 2005) ("A reprimand . . . will only constitute an adverse employment action if it adversely affects the terms and conditions of the plaintiff's employment

---

[144] Doc. no. 42, p. 40.

[145] Doc. no. 44, p. 37.

[146] Doc. no. 42, p. 40.

— for example, if it affects the likelihood that the plaintiff will be terminated, undermines the plaintiff's current position, or affects the plaintiff's future employment opportunities.").

The Eleventh Circuit's stance on this progressive discipline theory, however, is not so clear.  The court is not aware of any published opinion on point.  An unpublished opinion that casts some light on the subject is *Summerlin v. M & H Valve Company*, 167 Fed. Appx. 93 (11th Cir. 2006).  There, the Eleventh Circuit engaged in a fact-intensive analysis of the consequences of the plaintiff's letter of reprimand before concluding that it did not clear the adverse employment action hurdle.  *Id.* at 97.  The panel explained the argument and its holding as follows:

> Summerlin does not allege that the written discipline affected any important condition of his employment, such as salary, benefits, title, or job duties.   Rather, he insists that the reprimand was an adverse employment action because M & H [his employer] cited the written discipline as evidence of Summerlin's poor work when the EEOC investigated Summerlin's claims.  However, the EEOC's consideration of the discipline did not tangibly harm Summerlin.  The EEOC still found reasonable cause for Summerlin's failure to promote claim.

*Id*. *Summerlin* is factually distinguishable; rather than arguing that the employer relied upon the reprimand when *imposing* further discipline, the plaintiff there contended that the reprimand altered the terms and conditions of his employment because the employer pointed to it in justifying adverse action (failure to promote)

-36-

*after the fact*.  Still, the legal principle to be taken away from the decision is fully applicable here:  *i.e.*, without a showing that some collateral, tangible harm flows proximately from a reprimand, the reprimand does not stand alone as an adverse employment action.

Knight has failed to make this showing.  While she can easily prove that her superiors *considered* the letter of reprimand along with many other factors in deciding to suspend her, Knight has produced no evidence indicating — or even suggesting — that the letter of reprimand, *independently and of its own force*, precipitated her subsequent suspensions or any other adverse action.  *See Oest v. Department of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001) ("With the benefit of hindsight, it can be said that, in this case, each oral or written reprimand brought Ms. Oest closer to termination.  Such a course *was not an inevitable consequence of every reprimand*, however; job-related criticism can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship.") (emphasis supplied).  *Cf. Merriweather v. Alabama Department of Public Safety*, 17 F. Supp. 2d 1260, 1275 (M.D. Ala. 1998) (holding that a written counseling statement did not constitute adverse employment action where the plaintiff did not produce "any evidence to support that she has been fired, demoted or denied any pay increase *because of the counseling*") (emphasis supplied), *aff'd mem.*, 199 F.3d 443 (11th Cir.

-37-

1999).  To the contrary, the letter, by its very terms, represents merely the first "step toward improving a situation that [supervisors could not] allow to continue."[147]  True, the suspension notices cite the letter of reprimand as one of several "prior incidences to *further* support the proposed action,"[148] but Knight does not claim the letter was anything close to the deciding factor.  The suspension documents all refer to *multiple* prior disciplinary instances aside from the letter, in addition to the actual conduct that led to the decision to contemplate suspension in the first place.

Drawing inferences in Knight's favor, the most the court can say is that it is *possible* that the letter of reprimand was a pivotal consideration in the suspension decisions; on the other hand, it is equally likely that the letter was an insignificant factor.  *See Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) ("[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation.").  *Cf. Davis*, 245 F.3d at 1239 (explaining that "the asserted impact [of the employment action at issue] cannot be speculative").  Certainly, there is nothing in the record that comes even close to showing that, but for the letter, suspensions would not have been imposed.  Therefore, the letter cannot be bootstrapped into the category of adverse

---

[147] Doc. no. 41, Ex. K, ¶ 3.

[148] *See*, *e.g.*, *id.* at Ex. L, ¶ 3 (emphasis supplied).  This exact quote is not present in each letter, but variations of it or similar language appears in all suspension documents.

action merely because the suspensions fall into that grouping.  *See Summerlin*, 167 Fed. Appx. at 97; *Davis*, 245 F.3d at 1241; *Weston*, 251 F.3d at 431;*Oest*, 240 F.3d at 613; *Merriweather*, 17 F. Supp. 2d at 1275.

There is, however, one other possible basis for concluding that the letter was an adverse employment action — although Knight neglects to mention it.  That is, Bowden also testified that she would have considered Knight's disciplinary problems prior to her performance evaluation in selecting an appropriate rating.[149]  Among those disciplinary problems was the letter of reprimand itself, which remained in Knight's personnel file at the time the evaluation was handed down.  This connection is interesting in light of the Eleventh Circuit's reasoning in *Davis*, *supra*.  As will be recalled, the court in *Davis* actually held that a negative performance memorandum did *not* rise to the level of adverse employment action.  *Davis*, 245 F.3d at 1240.  In so holding, however, the panel was careful to note that "shortly after this memo, Davis received his annual evaluation with an overall rating of 'excellent' and thereby received a contractually-mandated salary increase, *further suggesting that the memo did not have a material impact on the terms and conditions of his employment*."  *Id*. (emphasis supplied).  The exact opposite occurred here.

Within approximately one month of the letter of reprimand, Knight received

---

[149] Doc. no. 39, Ex. 6, p. 98, lines 8-21.

her annual performance evaluation, in which Bowden and Morrow had rated her "Satisfactory."   Bowden admitted that Knight's history of disciplinary problems (which included the letter of reprimand) was "part of the rating."[150]  Just like in *Davis*, an "Excellent" rating on the performance evaluation here would have entitled Knight to a cash bonus or a performance-based pay increase.  Assuming — momentarily only — that the "Satisfactory" performance evaluation was an adverse action, one might reasonably argue that the letter which influenced that evaluation also was an adverse action.

As with the suspensions, though, there is no evidence in the record to suggest that the letter of reprimand specifically was the deal-breaker.  When initially asked about the reasons for the "Satisfactory" rating, Bowden cited "work performance" repeatedly.[151]  Indeed, she did not state that she considered disciplinary history until prompted to do so late in the deposition by counsel for the Secretary.  Even when she did, she only acknowledged generally considering past discipline, without specifically mentioning the letter of reprimand or stating that it carried any more weight than the other incidents that occurred over the previous year.  Simply put, Knight has again failed to identify any evidence of a reasonably direct correlation between the letter

---

[150] *Id*. at line 20.

[151] *See generally id*. at pp. 23-35.

of reprimand and an adverse employment action.  Hence, the motion must be granted insofar as it seeks dismissal of Count I.

### b.    The performance evaluation

The court's resolution of the letter of reprimand issue perhaps vaguely foreshadows the conclusion on the question of whether Knight's supervisors' action in rating her "Satisfactory" on the 2002-2003 performance appraisal was an adverse employment action in and of itself.  Any discussion of this issue must start by citation to *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249 (11th Cir. 2001), in which the Eleventh Circuit held that negative performance evaluations, "standing alone, do not constitute adverse employment action sufficient to satisfy the second element of a prima facie case of retaliation under the ADA."  *Id.* at 1261.  However, as the Eleventh Circuit recently clarified:  "an evaluation that *directly disentitles* an employee to *a raise of any significance* is an adverse employment action under Title VII."  *Gillis v. Georgia Department of Corrections*, 400 F.3d 883, 888 (11th Cir. 2005) (emphasis supplied).  *See also Brown v. Snow*, 440 F.3d 1259, 1265 (11th Cir. 2006) ("A lower score on Brown's performance evaluation, by itself, is not actionable under Title VII unless Brown can establish that the lower score led to a more tangible form of adverse action, such as ineligibility for promotional opportunities.").

Building on this, Knight asserts that "[t]he evidence before this Court on

summary judgment establishes that the negative performance evaluation directly impacted Knight's eligibility for a pay increase. Had Knight received her customary 'Excellent' performance evaluation she would have received a cash award."[152]  The Secretary shoots back that a rating of "Satisfactory" — middle of the road on a five-tiered scale — is not necessarily "negative," and further, that no one is *entitled* to a discretionary pay increase or cash award.[153]  The court agrees that it is a bit over the top to characterize an "Excellent" performance evaluation as "customary," but semantics aside, it seems reasonable to say that any performance rating that is accompanied by an automatic cash bonus or salary increase represents the level of performance that an employer desires.  Accordingly, a performance rating (be it "awful," "satisfactory," "almost wonderful," *etc.*) that *does not* include such niceties is, at least in some sense, "adverse."  *See generally Gillis*, 400 F.3d at 888.[154]

*How adverse*, of course, depends on what is at stake.  *See Bass*, 256 F.3d at 1118 ("The question of whether an employee has suffered a materially adverse employment action will normally depend on the facts of each individual case.").  The court in *Gillis* was careful to state that "this case does not involve disentitlement to

---

[152] Doc. no. 42, p. 40.

[153] *See* doc. no. 44, p. 37.

[154] The Secretary has cited district court opinions and cases from other circuits that reach different results, but they are irrelevant given *Gillis*.

a *de minimis* raise." *Gillis*, 400 F.3d at 888.  To be precise, "had Gillis's supervisors decided that she exceeded expectations, as opposed to just meeting expectations, she would have received an additional $912.36 per year in compensation,"*id*., or "$76.03 per month."  *Id*. at 886.  Further, "[a]ny future raises would be based on Gillis's increased salary." *Id*. at 888.  Considering this, the court held that "the denial of the raise at issue here was an employment decision that significantly affected Gillis's compensation." *Id*.  In this case, Morrow and Bowden explained that an "Excellent" rating would have entitled an Knight to *either* a performance-based pay adjustment or a cash bonus, but a rating of "Satisfactory" directly disentitled her to either.[155]  In the case of an "Excellent" review, the decision of which benefit to award was up to management.

Neither Morrow nor Bowden, however, answered the question that is responsive to the *de minimis* exception enunciated in *Gillis*.  Knight handled that task herself, explaining that a performance-based pay increase would "probably be about five to ten cents."[156]  (Because Knight was paid by the hour,[157] the court presumes that Knight means five to ten cents *per hour*.)  This revelation appears to sink any claim

---

[155] *See* doc. no. 39, Ex. 4, p. 88, line 16 - p. 89, line 13; *id*. at Ex. 6, p. 21, lines 6-15.

[156] *Id*. at Ex. 1, p. 106, line 22.  A far as the court can tell, there is no evidence in the record indicating the amount of the alternative cash award.

[157] *Id*. at p. 21, lines 1-6.

that the raise at issue would be anything more than *de minimis*.  After all, assuming *generously* that Knight worked forty hours every week and took no vacations, a ten cent an hour pay increase would amount to only $208 annually ($16 monthly), as opposed to the approximately $900 a year ($76 a month) at issue in *Gillis*.  *Cf. Embry v. Callahan Eye Foundation Hospital*, 147 Fed. Appx. 819, 829 (11th Cir. 2005) (holding that a one day suspension resulting in the loss of $88.73 in compensation did not constitute "a *serious and material* change in the terms, conditions, or privileges of employment") (internal quotations omitted) (emphasis in original).

On the other hand, Knight also testified — and no one appears to have contradicted her — that "anytime you get a satisfactory that that [*sic*] would keep you from getting any type of monetary awards or on-the-spot awards [throughout the year]."[158]  Taking Knight's claim as true, it bears *some* significance, but still does not suffice to cross the adverse employment action threshold.  While the parties have agreed that Knight received three "On the Spot" awards in 2002 alone, it is undisputed that these awards are *not* guaranteed.[159]  Moreover, the stipulated facts do not reveal the sum awarded, nor does it appear that they are always substantial. Knight testified that some of her cash awards were on the order of $250, although she

---

[158] *Id*. at p. 106, line 25 - p. 107, line 3.

[159] Doc. no. 42, Statement of Undisputed Facts, ¶¶ 258, 260-261.

did not imply that it was the "On the Spot" awards that reached this amount.[160]
(Incidentally, Margaret Lamb testified that she had received much more modest $2
"On the Spot" awards on more than one occasion.[161])  Adding up the, *at most*, $208
attributable to a performance-based pay increase, and assuming two $250 "On the
Spot" awards, the "Satisfactory" rating might be blamed for a loss of $708 over the
course of a year.   The court is willing to assume that, if the bonuses can be
considered, this figure would be sufficiently close to the amount at issue in *Gillis* to
elude the *de minimis* exception, but there is still one lingering question:  does a
performance review that disqualifies an employee from eligibility for receipt of future
discretionary compensation constitute an adverse employment action?

Other than what was said in *Gillis* about "direct disentitlement," the Eleventh
Circuit apparently has not confronted this question.  At least one circuit, however, has
answered it in the negative.  *See Powell v. Rumsfeld*, 42 Fed. Appx. 856, 860 (7th Cir.
2002) ("The potential of losing an already discretionary bonus does not, however,
constitute a material change [in working conditions].") (citing *Rabinovitz v. Pena*, 89
F.3d  482, 488-89 (7th Cir. 1996) (holding, in turn, that "loss of a bonus is not an
adverse employment action in a case such as this where the employee is not

---

[160] Doc. no. 39, Ex. 1, p. 130, lines 11-35.

[161] *Id*. at Ex. 5, p. 14, lines 1-7.

automatically entitled to the bonus")).  These decisions are well-reasoned, and in the absence of any Eleventh Circuit cases on point, the court sees fit to follow them, as they seem consistent with the principles enunciated in *Gillis*.  The court in *Gillis* placed emphasis on the requirement of *direct* disentitlement — not to mention the fact that the holding was limited to *raises*.  Since Knight was not *entitled* to any "On the Spot" awards at the time she received the "Satisfactory" rating, that rating could not have directly disentitled her to the bonus that accompanies such awards.  Accordingly, the court holds that, on these facts, the loss of a bonus does not help the "Satisfactory" rating escape the *de minimis* exception, and Count IV of the complaint is due to be dismissed for failure to allege an adverse employment action.

However, because this is a reasonably close question, the court also discusses the "Satisfactory" performance appraisal in the subsequent sections of this opinion, and concludes in the alternative that Knight has failed to rebut the Secretary's legitimate, nondiscriminatory reasons for the rating.

### 3.   Causation

Having decided that the two suspensions crossed the "threshold level of substantiality" and, thereby, constituted adverse employment actions, the court must determine whether there is sufficient evidence to suggest that those adverse actions were causally related to Knight's participation in protected activities.  The court also

considers the "Satisfactory" performance rating, even though it has already concluded that the rating was not an adverse employment action.

To prove causation at the summary judgment stage, a plaintiff must simply establish that the adverse employment action and the protected activity were "'not wholly unrelated.'" *Shotz v. City of Plantation, Florida*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003) (quoting *Farley v. Nationwide Mutual Insurance Company*, 197 F.3d 1322, 1337 (11th Cir. 1999) (tracing the quoted phrase to *Simmons v. Camden County Board of Education*, 757 F.2d 1187, 1189 (11th Cir. 1985)). *See also*, *e.g.*, *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004); *Gupta*, 212 F.3d at 590. This necessarily requires proof that the decision makers were *aware* of the protected conduct at the time the decision to take adverse action was made. *E.g.*, *Shotz*, 344 F.3d at 1180 n.30; *Farley*, 197 F.3d at 1337; *Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[A] plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action.").

But awareness alone is not enough; there must be other, additional circumstances suggestive of causation. *See*, *e.g.*, *Gupta*, 212 F.3d at 590. Generally speaking, this means that a plaintiff may resort to proof of "a close temporal proximity between [the] two events," because such "may support a finding of a causal

-47-

connection between those two events." *Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001) (citing *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (stating "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection"). But two caveats apply to this method of proof. First, the Supreme Court has indicated that, to be sufficient standing alone, the temporal gap between events must be "'very close.'" *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001) (*per curiam*) (quoting *O'Neal v. Ferguson Construction Company*, 237 F.3d 1248, 1253 (10th Cir. 2001)).[162]  Second, "[i]t is important to emphasize that it is causation, not temporal proximity itself, that is an element of [a] plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." *Kachmar v. Sunguard*

---

[162] In full text, the Supreme Court's statement in *Breeden* concerning temporal proximity is as follows:

> The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001).  *See e.g., Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992) (4-month period insufficient).  Action taken (as here) 20 months later suggests, by itself, no causality at all.

*Breeden*, 532 U.S. at 273-74.

*Data Systems*, *Inc.*, 109 F.3d 173, 178 (3d Cir. 1997). Accordingly, "when there may be valid reasons why the adverse employment action was not taken immediately," *id.*, or where the plaintiff "produce[s] sufficient alternative evidence," *Embry*, 147 Fed. Appx. at 831, "the absence of immediacy between the cause and effect does not disprove causation." *Kachmar*, 109 F.3d at 178. *See also Higdon*, 393 F.3d at 1220 ("If there is a substantial delay between the protected expression and the adverse action[,] *in the absence of other evidence tending to show causation*, the complaint of retaliation fails as a matter of law.") (emphasis supplied).

### a.   **Temporal proximity**

The facts of this case do not permit Knight to rely upon temporal proximity alone to prove causation. That is because, contrary to the implications inherent in Knight's argument, the temporal connection must be measured from the date the alleged discriminating official *first* became aware of the protected activity, not from the date of any event that might have *reminded* them of the activity. *See Farley*, 197 F.3d at 1337 (requiring a plaintiff to provide "sufficient evidence that the decision-maker *became aware* of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action") (emphasis supplied); *Vandesande v. Miami-Dade County*, 431 F. Supp. 2d 1245, 1257 (S.D. Fla. 2006) ("In light of the possibility that the supervisor's awareness may not be

contemporaneous with the protected activity, it is the [date of the] supervisor's awareness that is relevant [not just the date of the activity]."); *Gibbs v. City of New York*, No. 02-CV-2424-LB, 2005 WL 497796, at * 11 (S.D.N.Y. January 21, 2005) ("In analyzing causation, the Court considers when defendant *first became aware* of plaintiff's protected activity.") (emphasis supplied) (citing *Breeden*, 532 U.S. at 273).

Knight argues, for instance, that there is a close temporal connection between her EEO complaints and the "Satisfactory" performance evaluation issued on April 24, 2003, because "Ms. Bowden acknowledged that by March 31, 2003 she was fully aware of Knight's engagement in protected activity."[163]  It may be entirely true that Bowden was aware of the fact that Knight had engaged in EEO activity *as of* that date, but that absolutely was not the *first time* she gained such knowledge.  Indeed, tracing back from the date of the negative performance evaluation, Knight's most recent initiation of contact with the Army's EEO office was September 18, 2002.  As discussed in Part I-B of this opinion, Morrow and Bowden — the two supervisors who signed the performance evaluation — learned of this activity *no later than* mid-October, 2002.  Therefore, by the time they issued the "Satisfactory" performance evaluation, they had been aware of Knight's EEO activities for approximately six months.  Both the Supreme Court and Eleventh Circuit have indicated that even a

---

[163] Doc. no. 42, p. 41.

period as short as three months is too long to constitute independent evidence of causation.  *See Breeden*, 532 U.S. at 1511; *Higdon*, 393 F.3d at 1221.[164]

Knight contends that "[t]he temporal time frame involving the 10-day and 14-day suspension is even clearer."[165]  With respect to the ten day suspension, she points to equivocal evidence indicating that Morrow would have learned of additional EEO activity on or around May 12, 2003.[166]  (Knight filed a new, informal EEO complaint on May 14, and allegedly told Morrow of her intent to do so two days earlier.)  Knight then reminds the court that she was suspended only a few days later, on May 21, 2003.  What she leaves out, of course, is that May 21 is the date on which her suspension was *implemented* by Martin.  The suspension was actually *proposed* by Morrow back on May 5, more than a week prior to the time when she arguably learned of Knight's new EEO activity.  In other words, the suspension was already in the works by the time Knight rushed to file this EEO complaint, and thus the close

---

[164] It is worth noting that Knight's reliance upon temporal proximity alone would be misplaced *even if* the court accepted her unfounded argument that Bowden did not learn of the September 2002 EEO activity until January 17, 2003 (*see* doc. no. 42, p. 41), for the period of time between that date and April 24, 2003 is still in excess of three months.

[165] Doc. no. 42, p. 41.

[166] The court discussed this evidence in detail *supra*, at Part I-D of this opinion, and essentially rejected reliance upon it.  Nevertheless, viewing the facts in the light most favorable to Knight, the court will assume (for the limited purpose of addressing this aspect of Knight's argument) that the evidence conclusively establishes that Morrow knew of fresh EEO activity by Knight as of May 12, 2003.  Of course, Knight had not even filed her informal complaint on that date.  This matters little, however, for the discussion in the text above makes clear that even this generous assumption does not meaningfully assist Knight's case.

chronology is irrelevant to the causation calculus.  *See Saffold v. Special Counsel, Inc.*, 147 Fed. Appx. 949, 951 (11th Cir. 2005) ("When an employer makes a tentative decision *before* protected activity occurs, the fact that an employer proceeds with such a decision is not evidence of causation.") (emphasis in original).  *See also Breeden*, 532 U.S. at 272 ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); *Summerlin*, 167 Fed. Appx. at 97 (holding that the plaintiff failed to establish a causal connection between protected activity and adverse action where the employer made the decision to write the plaintiff up ten days before the plaintiff filed an EEOC complaint, even though the formal write-up did not issue until several days after the complaint was filed).[167]

---

[167] Although Knight does not make the argument, the court would be remiss if it failed to confront one alternative theory that might lurk in the interstices of *Breeden*, *Saffold*, and *Summerlin*. All of those cases involve employment decisions that were contemplated by a single supervisory official prior to the plaintiff's participation in protected activity, and then adopted and implemented by *the same official* subsequent to the protected activity.  Here, however, Knight's ten day suspension was originally proposed by Morrow prior to the protected activity at issue, and then Morrow's proposal was reviewed and adopted by a *different* supervisor, Martin, roughly one week after the protected activity.  Assuming *arguendo* that Martin actually learned of the protected activity prior to considering the proposal, one might argue that she would be more inclined to sustain it — or, indeed, that she would do so solely as retaliation for Knight's protected activity.

Alas, the court can reject this theory in fewer words than it took to articulate it.  For one thing, absent some solid evidence that the protected activity was a consideration in the final decision, it would be extremely speculative to presume that the proposal did not stand on its own.  More importantly, though, the same concern that drove the decision in *Breeden* pertains here:  accepting this inference would give all employees who are aware that some adverse action is currently being

As for the fourteen day suspension, Knight claims that "the temporal time frame involved . . . is just a little over one (1) month."[168]  She arrives at this conclusion by urging the court to selectively consider events that are not actually relevant to the traditional temporal proximity inquiry.[169]  Although manipulating the facts in this way tightens the temporal gap, a clearer recitation of the chronology shows that it makes little logical sense.  The fourteen day suspension was proposed by Bowden on September 24, 2003.   Bowden's proposal was adopted and implemented by Morrow on November 13, 2003.  As of the date of implementation, Knight's most recent initiation of EEO activity was still the informal complaint she filed on May 14, 2003.  At the very latest, Morrow learned of this complaint by early June,[170] and it was formalized shortly afterwards on June 22, 2003.

Given all of this, the pertinent time frame clearly runs from the date on which Morrow first gained knowledge of the complaint (early June), to the date of the suspension itself (mid-November).  Presumably recognizing that the temporal gap between June and November is a lengthy five months, Knight conveniently skips

---

contemplated by their employer an incentive to file a charge of discrimination, so as to create the impression of retaliation; further, it would essentially paralyze employers, who have an obvious interest in expeditiously resolving ongoing disciplinary matters.

[168] Doc. no. 42, p. 42.

[169] *Id*.

[170] *See* Part I-B, *supra.*

ahead to October 10, 2003, the approximate date on which Morrow received notice that the Army had accepted Knight's formal EEO complaint of June 22, 2003.[171] From there, she fast forwards to November 13, 2003, the date Morrow imposed the suspension.[172] Thus, she arrives at a temporal gap of only about four weeks.[173] These suspect calculation methods will not suffice.  By the time Morrow received the Army's notice of acceptance, she had already known about Knight's latest bout of EEO activity for at least four months.  The most the EEO acceptance letter could have done is merely *remind* Morrow of the continued pendency of Knight's latest EEO complaint.  However, it is the date of the initial knowledge, and not the date of various reminders, that is important in measuring temporal proximity.  *See Breeden*, 532 U.S. at 273 (refusing to start the clock on the date that the EEOC issued a right to sue letter that a supervisor allegedly learned of, since the proper trigger point would be when the supervisor *first* learned of the existence of an EEOC complaint — in that case, twenty months prior to the adverse action).  Here, once all the layers are peeled back, it is clear that no less than five months lapsed between early June 2003, when Morrow learned of Knight's EEO complaint, and mid-November 2003, when

---

[171] Doc. no. 42, p. 42.

[172] *Id*.

[173] *Id*.

she implemented the proposed suspension.[174]

Accordingly, Knight cannot rely upon time alone in establishing causation. *See*, *e.g.*, *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("We are not persuaded that three months . . . is sufficiently proximate to show causation."); *Higdon*, 393 F.3d at 1221 ("By itself, the three month period between the September 29 letter and the December 31 incident does not allow a reasonable inference of a causal relation between the protected expression and the adverse action."); *Maniccia v. Brown*, 171 F.3d 1364, 1370 (11th Cir. 1999) (citing approvingly a Tenth Circuit case holding that a four month period between protected activity and termination was too long).

### b.    Alternative evidence of causation

The absence of a suspicious chronology is not necessarily fatal to Knight's case. As explained above, the courts have recognized the possibility of proving causation through means other than temporal proximity.  *See*, *e.g.*, *Sirminski v. Transouth Financial Corporation*, 216 F.3d 945, 951 (11th Cir. 2000); *Maniccia*, 171 F.3d at 1370.  Indeed, while many plaintiffs (including Knight) appear to believe that

---

[174] Notably, Knight would not able to rely on temporal proximity to show causation for this claim even if the court were to hold that the date of the adverse employment action was the date of the proposal, rather than implementation.  The proposal was issued on September 24, 2003, a full three months after Knight formalized her most recent EEO complaint. *Cf. Higdon*, 393 F.3d at 1221 (holding that three months between protected activity and adverse action is too long to evidence causation).

time is of the essence, as it were, alternative proof of causation, where available, is equally useful, if not more probative.  After all, the plaintiff's burden at the summary judgment stage is simply to produce enough evidence to convince a rational jury that the protected activity and adverse actions were "not completely unrelated." *Pennington*, 261 F.3d at 1267 (internal quotation and citation omitted).  Knight, however, has not formulated any causation arguments based on alternative evidence. Still, certain evidence discussed in the pretext portion of her brief has some bearing on causation, so the court will consider that evidence here *sua sponte*.  *See*, *e.g.*, *Weston v. Pennsylvania*, 251 F.3d 420, 432 (3d Cir. 2001) (noting that "pretext evidence can be relevant to causation").

Perhaps Knight's most eye-catching evidence in this regard is a curious comment made by Morrow to an EEO investigator who was researching the basis of Knight's September 18, 2002 charge of discrimination.   Speaking of Knight's complaints, Morrow said something to the effect that "the constant presence of a threat of a [EEO] complaint is disruptive to the maintenance of a harmonious workplace."[175]  Importantly, Morrow did not state that this was the motivation for any adverse action she took against Knight; and, indeed, the comment was made at least six months prior to the earliest remaining adverse employment action in which

---

[175] Doc. no. 42, Statement of Undisputed Facts, ¶ 130.

Morrow was involved — the performance evaluation.  Even so, according to Knight, Morrow vocalized this opinion to her in person as well, stating that the EEO complaints caused her problems and disrupted the office atmosphere.[176]  Viewed in the light most favorable to Knight, these comments are powerful evidence that Morrow was at least annoyed by Knight's participation in protected activities and wanted her to stop.  Rather than stopping, Knight continued to cooperate with the EEO and, consequently, Morrow was repeatedly summoned as the agency witness to answer her allegations before an EEO investigator.  Despite their initial impact, however, these comments do not carry the day.

### i.    The ten day suspension

It must be remembered that, while Morrow played a role in each of the three remaining adverse employment actions, she was not the always the critical figure. This is especially hurtful to Knight's claim that the ten day suspension was retaliatory.  If one were to assume that Morrow was the decision maker on that suspension, there would be ample evidence to submit the issue to a jury:  not only did Morrow previously make comments about how she was annoyed by Knight's EEO activities, she admitted she was motivated to propose the ten day suspension primarily because Knight had disclosed her participation in oppositional activities to Military

---

[176] *Id*. at ¶ 129.

Police officers, and implied that Morrow had not been responsive to her workplace harassment concerns.   Although Morrow advances a legitimate reason for the proposal — *i.e.*, she regarded Knight's conduct as insubordinate — a reasonable juror could conclude that retaliation was the true motivation.

The fact of the matter, however, is that Morrow's role in the ten day suspension was limited to *proposing it*.   It was Morrow's own supervisor, Martin, who independently reviewed the reasons supporting the suspension and drafted her own opinion adopting and implementing the recommendation.   Knight does not rely upon any "cat's paw" theory to suggest that Martin merely rubber-stamped Morrow's allegedly tainted recommendation without any sort of independent consideration, and there is no evidence to support such a claim in any event.   *See Grier v. Snow*, No. 06-12231, 2006 WL 3026129, at * 3 (11th Cir. Oct. 26, 2006) (citing *Llampallas v. Mini-Circuits Laboratories*, *Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998)).

Knight does not have any evidence whatsoever that Martin specifically was bothered by her EEO activities.   She does cite to testimony by another non-supervisory ACRC employee, Dean Curry, in which Curry acknowledges warning Knight, around March 2002, that constant complaints to Martin might result in Knight's eventual termination.[177]   Of course, at the time of this warning, Knight had

---

[177] Doc. no. 39, Ex. 2, pp. 65-69.

not filed any EEO complaints, and Curry's testimony indicates that she was referring to Inspector General complaints and general whining to Martin about workplace disputes.  What is more, Curry indisputably did not base this warning on any personal knowledge of Martin's predispositions or other evidence that Martin would retaliate against employees for EEO activities.[178]  In fact, when asked if she thought Martin actually did retaliate against Knight, Curry testified with conviction that she did not.[179]  This speculative warning, given by a non-supervisory employee with no actual knowledge of the situation, over one year prior to the adverse action in question, simply does not suffice to show causation.[180]

Accordingly, Knight has failed to establish a causal linkage between her protected activities and the ten day suspension through either suggestive temporal proximity or other proof, and the motion for summary judgment must be granted insofar as it seeks dismissal of Count II of her complaint.

### ii.    The fourteen day suspension and performance evaluation

---

[178] *Id*. at p. 69, lines 2-11.

[179] *Id*. at p. 63, line 18 - p. 64, line 3.

[180] Finally, the affidavits from two co-workers (doc. no. 39, Ex. 13, ¶ 8; *id*. at Ex. 14, ¶ 12), who state that Knight's general relationship with "management" deteriorated following her EEO activities are far too vague to meaningfully assist Knight.  These generalized statements do nothing to draw a connection between Knight's EEO filings and specific disciplinary measures taken against her.  Further, when considered alongside the facially legitimate justifications put forward by ACRC supervisors for those measures, they do not discredit them.

The alternative evidence of causation with respect to the fourteen day suspension and "Satisfactory" performance evaluation is no different from that which has been discussed above.  The vague affidavits from co-workers and the conjectural word of warning from Curry are still unpersuasive.  Even so, because Morrow personally signed off on the performance evaluation, and personally approved the proposal for a fourteen day suspension, her commentary expressing open disdain for Knight's constant EEO activity is somewhat more forceful in this context.  Although there is a significant time gap between Morrow's comments to the EEO officer and the adverse employment actions at issue here, this is ameliorated by the fact that Morrow reaffirmed these sentiments at her deposition.[181]  Taking all of this into consideration, the court concludes — on a *very* close call — that Knight has sufficient evidence of causation to support Counts III and IV of her complaint, pertaining to the fourteen day suspension and the "Satisfactory" performance evaluation, respectively. Given this commentary from Morrow, and without considering the Secretary's proffered legitimate, nondiscriminatory reasons, a reasonable jury could conclude that the subsequent adverse actions against Knight were at least not *completely* unrelated

---

[181] *See* doc. no. 39, Ex. 4, p. 50, lines 2-4 (answering "Yes, I do" to the question "You consider [EEO activity and/or the threat thereof] disruptive to the work environment; is that right?"). She did clarify, for what it is worth, that it is "[n]ot *necessarily* the [EEO] complaints"; rather, she is perturbed by "the actions of what goes on." *Id*. at p. 49, lines 22-23 (emphasis supplied).  The court notes that, interpreted in the light most favorable to Knight, this could be taken as meaning that Morrow was bothered by the entire process that EEO activity entails.

to Knight's protected activities.

**B.      Legitimate, Nondiscriminatory Reasons and Pretext**

Now that the court has pared down the actionable adverse actions to the fourteen day suspension, it remains to consider, in full, Knight's arguments that the Secretary's proffered nondiscriminatory reasons are pretextual.  As contemplated above, the court also considers Knight's arguments that the reasons given for the "Satisfactory" performance evaluation are pretextual, as an *alternative* basis for concluding that Count IV must be dismissed.  (There appears to be no dispute that the Secretary advanced legitimate, nondiscriminatory reasons for each of the adverse actions complained of in Knight's pleadings — *i.e.*, poor work performance and insubordination.  *See*, *e.g.*, *Farley*, 197 F.3d at 1337; *Stewart v. Happy Herman's Cheshire Bridge*, *Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997).)  To assess pretext, "the district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Jackson v. Alabama State Tenure Commission*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting *Combs v. Plantation Planters*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

At the outset, the court notes that Morrow's suspicious remark about Knight's

EEO activity — while important — is not enough on its own to show pretext.  *Cf.*

*Embry*, 147 Fed. Appx. at 833 ("[A]lthough a comment unrelated to a challenged

employment decision may contribute to a circumstantial case for pretext, 'it will

usually not be sufficient absent some additional evidence supporting a finding of

pretext.'") (quoting *Scott v. Suncoast Beverage Sales*, *Ltd.*, 295 F.3d 1223, 1229 (11th

Cir. 2002)).  Most often, pretext will be found where the plaintiff introduces evidence

which raises viable questions as to the veracity of the proffered reasons.  *See Farley*,

197 F.3d at 1337.

Knight attempts to do just that with respect to her "Satisfactory" performance

evaluation.  The Secretary has asserted — and Bowden testified — that this rating

was selected due primarily to Knight's poor work performance, and secondarily, due

to her record of disciplinary infractions during the review period.[182]   At her

deposition, Knight appeared to contend that this was a pretextual excuse because, *in*

*her opinion*, the rating *should be* based on work performance alone.  Although this

argument does not readily appear in her response brief, it is worth noting that "[t]he

heart of the pretext inquiry is not whether the employee agrees with the reasons that

the employer gives for [adverse action], but whether the employer really was

---

[182] *See* doc. no. 39, Ex. 6, p. 27, lines 8-21; *id*. at p. 98, lines 8-21.  Morrow, the other
signatory on the performance evaluation, was not directly asked to explain the basis for the rating.

motivated by those reasons." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998). Indeed, "a plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, as long as the reason is one that might motivate a reasonable employer." *Pennington*, 261 F.3d at 1267 (internal quotations and citation omitted).

That issue aside, the arguments in Knight's brief are as follows. First, this was the first "Satisfactory" rating she had received during her time at ACRC, and it occurred subsequent to much of her participation in EEO activities.[183] This does not demonstrate pretext, since the same supervisors who filled out this performance review — Bowden and Morrow — had rated Knight "Excellent" the previous year, just over *one month* after Morrow learned that Knight was supporting a co-worker's EEO complaint.[184] Second, Knight calls attention to the fact that she received two "On the Spot" awards during the relevant review period, which arguably means that she was "doing a better than average job as Reservation Clerk."[185] *But see Scott*, 295 F.3d at 1229 n.1 (rejecting the theory that plaintiff's "receipt of the 'Salesman of the Quarter' award shortly before his termination shows that he was not considered a

---

[183] *See* doc. no. 42, p. 45.

[184] *See* doc. no. 41, Ex. R (Performance Evaluations for 2001 and 2002), p. 2. *See also* doc. no. 42, Statement of Undisputed Facts, ¶ 78.

[185] Doc. no. 42, p. 45-46. *See also* doc. no. 39, Ex. 4, p. 87, lines 9-13.

substandard employee," because "[plaintiff's] personnel file undeniably contains several write-ups and warnings indicating otherwise").  Although Morrow was inexplicably not asked the basis for the lower rating at her deposition, counsel for Knight successfully got her to admit that most reservation clerks received "Excellent" ratings and, further, that Knight was "[r]ight along with the rest of them" in the upper class of reservationists.[186]   Standing alone, this might be sufficient to establish pretext, but Knight *also* admitted that she had been counseled, reprimanded, and engaged in a disruptive confrontation with another employee during the evaluation period.[187]   Far from discrediting Bowden's testimony that the disciplinary history played a role in the evaluation, this lends credence to that claim.

Third, and finally, Knight asserts that she questioned Bowden about the rating immediately after it was handed down, and was told that she was rated lower "because I did not participate in a prayer service where they had a priest come into the break room . . . she felt that I was not a team player.  And that was the purpose for her satisfactory [rating]."[188]   The court notes that counsel for both parties erroneously state that Knight was talking about another employee, Margaret Lamb, but a glance

---

[186] Doc. no. 39, Ex. 4, p. 87, lines 1-8.

[187] *Id*. at Ex. 1, p. 103, line 18 - p. 104, line 21; doc. no. 33, Statement of Undisputed Facts, ¶ 50.  Knight further acknowledged that she was not aware of whether disciplinary history was a standard consideration. Doc. no. 39, Ex. 1, p. 105, lines 2-6.

[188] Doc. no. 39, Ex. 1, p. 107, lines 4-12.

at the actual excerpt reveals that Knight prefaced the above excerpt by saying "when the satisfactory came out my first question *to Yvonne* [Bowden] was, why did I receive that?"[189]

While this is a strange explanation that might actually evidence discrimination on the basis of *religion*, the possibility of pretext it injects into the record is not significant. *Cf. Tidwell v. Carter Products*, 135 F.3d 1422, 1428 (11th Cir. 1998) ("Although the identification of inconsistencies in an employer's *testimony* can be evidence of pretext," that is not so where "[a]t most, the jury could find that [reason] was an additional, but undisclosed, reason for the decision [that does not evidence the claimed discrimination].") (emphasis supplied). Even if it is true that Bowden originally justified her rating in this manner — and it appears she was not asked that question at her deposition — that would not make it any more likely that she was discriminating against Knight on the basis of her *protected EEO activit*y. If anything, it would evidence some other (presently irrelevant) discriminatory bias. It certainly does not take anything away from the uncontested evidence of disciplinary problems preceding the evaluation.

Since Knight has failed to rebut the Secretary's legitimate, nondiscriminatory reasons for the "Satisfactory" performance evaluation — which, in any case, does not

---

[189] *Id.* at lines 4-6 (emphasis supplied).

rise to the level of an adverse employment action — the court moves on to examine the reasons for the fourteen day suspension.  As will be recalled, it was Bowden who initially recommended this suspension following a dispute over a break with Knight. The dispute was somewhat heated, and apparently culminated with Knight purposefully not answering her phone when she knew that Bowden was calling her. Bowden testified, rightly or wrongly, that she regarded this as insubordinate, and it contributed to her decision to propose a suspension.  Knight questions the legitimacy of this reasoning, contending that she only failed to answer her telephone because she was sitting close enough to Bowden at the time to respond orally.[190]  To the extent this presents a factual dispute, it is not material, because the phone incident was not the sole basis for the proposed discipline.  Knight admits that immediately prior thereto, she insinuated in front of several co-workers that Bowden was playing favorites, remarking "I guess I'm not Marie" when Bowden told her that she needed to return from a break to cover for another employee.[191]  Finally, Bowden also cited a note that Knight delivered to her the same day, in which Knight informed Bowden that she was "very tackey [sic] and unprofessional," and recommended that "before you point the finger at me telling me I'm acting unprofessional take a look at

---

[190] Doc. no. 42, p. 47.

[191] Doc. no. 33, Statement of Undisputed Facts, ¶ 59.

yourself."[192]   Based on the totality of the circumstances, Bowden proposed the fourteen day suspension on grounds of insubordination, and Morrow subsequently approved it.

Counsel for Knight appears to believe that the punishment did not fit the crime, and cites to testimony from another employee who *personally* felt that at least some of Knight's comments were justified or benign.[193]   It is not the court's place to evaluate the reasonableness of an employer's reactions to such situations.  *Cf. Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999) ("An employer who [takes adverse action against] an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct.").  *See also Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [we do not] interfere.") (internal quotations and citations omitted); *Nix v. WLCY Radio / Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("[An] employer may fire an employee for a good reason, a bad reason, a

---

[192] Doc. no. 34, Ex. 17.

[193] Doc. no. 42, p. 47.

reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").

In short, nothing in the record sufficiently discredits the facial legitimacy of the proffered reasons for this suspension to raise a genuine issue of material fact as to whether the proffered reasons were "a coverup . . . for a discriminatory purpose." *Damon*, 196 F.3d at 1361. *See also Grigsby v. Reynolds Metal Company*, 821 F.2d 590, 597 (11th Cir. 1987) ("Where the defendant's justification evidence completely overcomes any inference to be drawn from the evidence submitted by the plaintiff, the district court may properly acknowledge that fact and award summary judgment to the employer.").

## PART THREE

### *Conclusion*

In accordance with the foregoing, defendant's motion for summary judgment is due to be granted in full. An appropriate order will be entered contemporaneously herewith.

DONE this 13th day of April, 2007.

_____
United States District Judge

-68-